Michael W. KRATZER,
Plaintiff-Appellee,

v.

CAPITAL MARINE SUPPLY, INC.,
Defendant-Appellant.

No. 80–3615
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

May 20, 1981.

---

James H. Daigle, James H. Brown, Jr., New Orleans, La., for defendant-appellant.

Brumfield & Brumfield, H. Alva Brumfield, III, Baton Rouge, La., for plaintiff-appellee.

Before BROWN, POLITZ and TATE, Circuit Judges.

TATE, Circuit Judge:

The plaintiff, Michael W. Kratzer, brought suit for negligence under the Jones Act, 46 U.S.C. § 688, for unseaworthiness under general maritime law, and for maintenance and cure to recover for the back injury he sustained aboard a barge while in the employ of the defendant, Capital Marine Supply, Inc. After a trial on the merits, the trial court found the plaintiff Kratzer to be 25% negligent and the defendant 75%, and apportioned the award accordingly. On appeal, the defendant contends principally that the district court erred (a) in failing to find Kratzer solely responsible for his own injury or, in the alternative, in finding him only 25% contributorily negligent; (b) in finding the free medical care tendered by the United States Public Health Service to be inadequate; and (c) in failing to rule on the issue of Kratzer's non-mitigation of his damage. We find no reversible error and therefore affirm the judgment of the district court, 490 F.Supp. 222.

*Facts*

The plaintiff Kratzer was employed by Capital Marine Supply as a member of the crew of the M/V BAYOU LAFITTE, a pushboat, and the barge CHOTIN 1200, a fuel flat used in conjunction with the M/V BAYOU LAFITTE to provide midstream refueling services to customer vessels. Both vessels were owned and operated by the defendant.

Kratzer, a tankerman, was working the night shift on the date of his injury, January 5, 1977. The other members of the crew assisting him in the refueling operation were Harry Boudreaux, the pilot of the M/V BAYOU LAFITTE, and Larry Paul Collins, a deckhand.[1]

During this particular work shift, the crew of the M/V BAYOU LAFITTE had to move the barge CHOTIN 1200 upstream to load diesel fuel and 55–gallon drums of oil onto it. This having been completed, pilot Boudreaux allowed the CHOTIN 1200 to drift downstream back toward the Baton Rouge location where both vessels would tie up.

During this navigational maneuver, Kratzer and Collins, who both remained aboard the CHOTIN 1200, primed a "Blackmar" pump located at the stern of the barge.[2] As part of this procedure, Kratzer placed the overflow line[3] of the "Blackmar" pump into a bucket on the deck of the barge to catch any overflow which may drip out once the pump was primed.[4]

Kratzer instructed the inexperienced Collins to watch for any overflow from the pump (thus signalling it was primed) into the bucket and to turn off the pump when this occurred. Following this, he went about performing some other functions. When he returned, Kratzer found that Collins had allowed diesel fuel to run over the brim of the bucket and onto the deck of the barge. Neither Kratzer nor Collins attempted to clean up the spill at that moment.

Later during the shift, Kratzer, in an attempt to get protection from the mist and cold of that early winter morning, appar-

---

1. It was established that, at the time of Kratzer's injury, Collins had only recently been employed by Capital Marine Supply and was extremely inexperienced. In fact, at trial he was unable to discern between "port" and "starboard." Consequently, Kratzer not only had to perform his own duties, but also many of those for which Collins was responsible.

2. The Blackmar pump was used to pump diesel fuel from the CHOTIN 1200 to customer vessels. Priming the pump would expedite this midstream refueling operation.

3. This particular overflow line was similar to the rubber hose on a gasoline pump.

4. The Blackmar pump was described as being surrounded by what laymen would call a "drip pan" (i. e., angle iron forming a perimeter around the pump). The bucket could have been placed within the drip pan, thus preventing any overflow from the bucket to spill onto the deck of the barge. However, on the night of the accident, Kratzer, as he customarily had done in the past (Trial p. 384), placed the bucket on the outside of the drip pan. Any overflow from the bucket would then spill onto the deck, as happened in this case.

ently stood in that same area where the fuel was spilled (Trial p. 376), with the result that his shoes became somewhat slick.

Shortly afterwards Kratzer slipped and injured his back while walking on the deck of the barge. Although no one at that time examined the spot where Kratzer fell, it was established at trial that the non-skid paint with which the barge was painted had been worn off in large areas due to the normal, everyday working operations of the barge.[5] Additionally, the steel plates which formed the deck of the CHOTIN 1200 were uneven in places due to periodic maintenance repairs. (It should also be noted that the deck was covered with an early morning mist.)

Kratzer brought suit for negligence under the Jones Act, for unseaworthiness under general maritime law, and for maintenance and cure against his employer, Capital Marine Supply. Based upon the preceding facts, the trial court concluded that: (a) Capital Marine Supply failed to use reasonable care to provide Kratzer with a safe place to work;[6] (b) Collins was negligent in failing to cut off the diesel fuel, and that this negligence was imputable to the defendant, and (c) Capital Marine Supply failed to furnish a seaworthy crew, for the crew was both incompetent and inadequate.[7] The trial court found the latter reason to be a proximate cause of Kratzer's injury.

Despite these findings, the trial court also found that Kratzer's own negligence contributed to his injuries. After the diesel fuel had been spilled, Kratzer failed either to clean it up himself or to instruct Collins to do it. Additionally, later during the shift, Kratzer, in avoiding the elements, stood in the area of the spill, which caused his shoes to become slippery.

Based on these findings, the trial court held that Capital Marine Supply was 75% negligent and Kratzer was 25% negligent.

*Issues*

The defendant Capital Marine Supply appeals on the following grounds: (1) The trial court erred in not finding Kratzer *solely* negligent or, in the alternative, in not finding Kratzer more than 25% negligent; (2) The trial court erred in finding the medical care provided by the U. S. Public Health Service to be inadequate, thus allowing Kratzer to recover for past and future care received from a private physician; and (3) The trial court erred in not making an express finding of fact with respect to Capital Marine Supply's defense of non-mitigation of damages by Kratzer.

### I. *Kratzer's Negligence*

The defendant contends on appeal that the district court was clearly erroneous in determining that Kratzer's own negligence was not the *sole* proximate cause of the accident. Alternatively, the defendant asserts that the district court erred in finding that Kratzer was only 25% contributorily negligent, rather than some larger percentage.

The district court's findings of fact in an admiralty case are binding unless clearly erroneous. Fed.R.Civ.Proc., Rule 52(a). In a judge trial of an admiralty claim, questions of contributory negligence and proximate cause are treated as fact questions, the finding of which should not be overturned on review unless clearly erroneous. *Fisher v. Agios Nicolaos V*, 628 F.2d 308 (5th Cir.), rehearing and rehearing en banc denied, 636 F.2d 1107 (5th Cir. 1980); *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir. 1980). A finding of fact is " 'clearly erroneous' when al-

---

5. Kratzer's fall was not the first to occur on the CHOTIN 1200. Willie Joe Anderson, a former deckhand, testified he had fallen twice on the barge, with one accident resulting from slipping on the wet deck area where the non-skid paint had worn off.

6. The court found that the uneven steel plates and the patches of unpainted areas combined

to make the deck of the CHOTIN 1200 unsafe for normal working conditions.

7. There was testimony presented at trial that there should have been two deckhands present, (Trial pp. 73, 386), despite a conflicting claim that one was sufficient. (Grantham Dep. p. 27).

though there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U. S. v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

After a thorough examination of the record before us, we are unable to say that the trial court erred with respect to its findings of negligence: Kratzer—25% and Capital Marine Supply—75%.

■ Kratzer was clearly contributorily negligent in that he failed to have cleaned up the diesel spill and then proceeded to step in it, thus making his shoes slippery. However, these two factors alone did not bring about Kratzer's accident. The trial court found that portions of the deck were extremely slippery due to (1) absence of non-skid paint; (2) the uneven metal sheets on the deck; and (3) the mist on the deck.

Finally, the trial court ruled, and we agree, that the proximate cause of Kratzer's injuries was the inadequacy and incompetency of the crew of the CHOTIN 1200. The crew was not only one deckhand short, but the deckhand present (Collins) was also extremely incompetent. It was Collins whose incompetence caused the diesel fuel to spill on the deck; and, while Kratzer was performing the duties of tankerman and two deckhands, he fell on the slippery (and improperly maintained) deck of the barge. It is not inconceivable that, had two competent deckhands been aboard the CHOTIN 1200, the diesel fuel spill would not have occurred.

We find that the district court did not err in its apportionment of the negligence which brought about Kratzer's unfortunate injury.

## II. *Inadequate Medical Care*

Kratzer was allowed by the district court to recover for his past and future medical expenses rendered by a private physician. The defendant contends on appeal that this was clearly erroneous, for a seaman is not entitled to reject free services available from government maintained hospitals without a showing that the treatment available is inadequate. *Kossick v. United Fruit Co.*, 365 U.S. 731, 736, 81 S.Ct. 886, 891, 6 L.Ed.2d 56 (1961). The district court found that care that Kratzer received at the United States Public Health Service Hospital was inadequate, and we agree.

At this point, it may perhaps be helpful to sketch the medical treatment that Kratzer received.

Shortly after he was injured, Kratzer was hospitalized at Doctors Memorial Hospital in Baton Rouge from January 5 to January 18, 1977. There he underwent various diagnostic evaluations. Dr. John Thomas, an orthopedic surgeon, concluded that Mr. Kratzer had suffered a cervical sprain syndrome with some cervical nerve root component as well as a lumbosacral sprain syndrome with possible nerve root visitation. (Plaintiff's Exhibit 8).

Kratzer was subsequently admitted on January 30, 1977, to Our Lady of the Lake Hospital in Baton Rouge for further diagnostic evaluations. Dr. William Fisher, a neurosurgeon, examined Kratzer and scheduled him to undergo a myelogram.[8] This myelogram was interpreted by Dr. Charles Greeson, who concluded that the plaintiff possibly had a herniated disk. (Fisher Dep. p. 13). Dr. Fisher ultimately concluded that Kratzer should be treated on an out-patient basis in a conservative fashion, rather than through surgery.[9]

On Feb. 15, 1977, the plaintiff's then attorney, James Dendee, requested that a master's certificate be issued to Kratzer. This master's certificate entitled the plaintiff to free medical treatment at the United States Public Health Service Hospital.

On February 21, 1977, Dr. Douglas Davidson, the U. S. Public Health Service contract doctor for Baton Rouge, conducted an

---

**8.** A myelogram is designed to show by contrast whether or not there are any irregularities within the intraspinal contents which would indicate that a nerve root is being incarcerated by a ruptured disc, a tumor, or arthritic process. (Fisher Dep. p. 11).

**9.** It should be noted that Kratzer's medical expenses incurred at these two hospitals were paid by the defendant in satisfaction of providing "cure" to an injured seaman.

examination of the plaintiff. Because Kratzer continued to experience back pains, on March 28, 1977, he referred Kratzer to the U. S. Public Health Service Hospital in New Orleans for still further inpatient treatment and diagnostic studies. He was thereafter tested at the hospital on several other occasions for this same injury. Among the tests conducted were (1) an unsuccessful (i. e., incomplete) discogram;[10] (2) an unsuccessful myelogram on 8/15/77 (the spinal needle used was inadequate); (3) another lumbar myelogram on 8/22/77, the results of which were inconclusive (Trial p. 42). Finally, Kratzer was discharged on September 9, 1977; the medical records indicated surgery was not warranted. (Plaintiff Exhibit 1).

Dr. Davidson, as Kratzer's treating physician and representative of the U. S. Public Health Service Hospital, also concluded, based on Kratzer's medical records, that Kratzer would continue to experience back pains (Trial p. 70) and that any further treatment, including surgery, would probably not alleviate it. However, Dr. Davidson could not definitely state that surgery would not help the plaintiff. (Trial p. 71–72).

On Dec. 5, 1977, Kratzer visited a private physician, Dr. John Watermeier, an orthopedic surgeon. Dr. Watermeier planned to make more diagnostic tests to ascertain if surgery were perhaps warranted. Dr. Watermeier advocated additional testings because, in his opinion, the tests conducted by the U. S. Public Health Service were of little value (Watermeier Dep. pp. 15, 42) and were conflicting with previous examinations of the plaintiff. (Watermeier Dep. p. 44, 54). Additionally, other information contained in the U. S. Public Health Hospital records warranted further, and successfully conducted, investigation. (Watermeier Dep. p. 55, 62, 63).

Arrangements were then made for Kratzer to be admitted to St. Charles General Hospital in New Orleans. However, because the defendant, Capital Marine Sup-

ply, refused to guarantee payment of the expenses, all planned tests had to be cancelled.

At trial, the district court found that Kratzer was entitled to care in the amount of $500 for past services rendered by Dr. Watermeier and $4,500 in future care to cover the costs of future hospitalization, testing, and potential surgery.

The defendant contends on appeal that Kratzer is not entitled to this award because he failed to establish that the care rendered by the Public Health Service Hospital was inadequate. We disagree.

■ As was recently articulated by this court, the general rule with respect to recovery for cure is that "a seaman has a duty to mitigate the costs of cure by accepting the employer's tender of free treatment by the Public Health Service unless the seaman establishes that these services are inadequate. If a seaman refuses the treatment of the Public Health Service *without just cause* he forfeits his right to recover the costs of his maintenance and cure." *Caulfield v. AC & D Marine, Inc.*, 633 F.2d 1129, 1133 (5th Cir. 1981); *Pelotto v. L & N Towing Co.*, 604 F.2d 396 (1979).

■ In the case before us, Kratzer fulfilled his duty to mitigate his damages by attempting to seek care from the Public Health Service Hospital. The record shows that from Feb. 21, 1977, through September 9, 1977, he was under the medical care of that facility and its doctors, among them Dr. Davidson. Dr. Davidson testified at trial that Kratzer's pain, in his opinion, would never be relieved and that his condition would remain "stable or deteriorate."

It was only after Mr. Kratzer had sought (unsuccessfully) a cure at the Public Health Service Hospital and the pain in his back continued to persist, did he go to a private physician (Watermeier) in hopes of a cure. As the district court opined, "Dr. Davidson's testimony clearly indicates that Kratzer would not receive further beneficial care at the U. S. Public Health Service Hospital." (Record p. 183).

10. A discogram is a procedure whereby a dye is injected into the actual disk, which in this case was situated between the two lumbar verte-

brae. The discogram performed on Kratzer was discontinued after inability to enter the disc space. (Plaintiff's Ex. 1).

We agree with the district court that the medical care received at the Public Health Service Hospital was inadequate. The difficulty and lack of success with which the tests were performed, in conjunction with the inconclusive and conflicting results furnished, show at the very least that further medical evaluations were warranted before the option of surgery was completely foreclosed. (Watermeier Dep. 15).

### III.  Non-Mitigation of Damage

■ Finally, the defendant contends on appeal that the judgment of the District Court should be vacated and the case remanded for further findings of fact based upon the court's failure to rule on its defense raised at trial of plaintiff's failure to mitigate his damages. Specifically, the defendant contends that because Kratzer is overweight (5 ft. 9 in. tall, 240 pounds) and did not attempt to lose weight at the suggestion of his doctors, that he failed to mitigate his damages. The defendant suggests that, because the trial court did not make a specific finding of fact on this issue, we must remand to the district court.[11] We find this contention unpersuasive.

■ Rule 52(a), Fed.R.Civ.P., requires the district court to make findings of fact and conclusions of law in "all actions tried upon the facts without a jury . . . ." If a court does not comply with the rule, the normal procedure for the appellate court is to vacate the judgment and remand the case for appropriate finding. Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976).

■ In this case, however, we find that a remand is not necessary since the record would not support a finding that Kratzer failed to mitigate his damages in not losing weight,[12] and, if the trial court had entered such a finding, it would have been clearly erroneous. See Tomlin v. Ceres Corporation, 507 F.2d 642, 648 n.2 (5th Cir. 1975). See also Gilbert v. Sterrett, 509 F.2d 1389 (5th Cir.), rehearing denied, 515 F.2d 510 (5th Cir. 1975), cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975); Boutte v. M/V Malay Maru, 370 F.2d 906 (5th Cir. 1967).

The evidence introduced by the defendant established at most that, in the opinion of Dr. Davidson, among others, a loss of weight might be helpful to the plaintiff.[13]

The defendant calls our attention to Muller v. Lykes Bros. Steamship Co., Inc., 337 F.Supp. 700 (E.D.La.1972), aff'd., 468 F.2d 951 (5th Cir. 1972). There, the plaintiff, grossly overweight, was claiming a knee injury and had failed to lose weight at the direction of his physician. The court in Muller held that "except in cases involving grave and serious operations, one must follow the expert recommendations of physicians or be precluded from recovering damages which might have been avoided thereby." 337 F.Supp. at 706.

Muller is factually distinguishable from that before us. There, the plaintiff (carrying 320 pounds on his 5'11" frame) had submitted to a doctor-administered weight reduction program. He stayed with the

---

**11.** We should note that the district court did not completely ignore the issue of Kratzer's weight. In finding of fact # 18, the court stated: "Dr. Davidson further testified that there would be less strain on Kratzer's back if he lost some weight and that he is now fit only for light work." (Record p. 181). Also see finding of fact # 16 (Record p. 180).

Although the district court didn't specifically find whether or not Kratzer had a duty to lose weight, findings should be liberally construed and found to be consonant with the judgment. Gilbert v. Sterrett, 509 F.2d 1389, 1393 (5th Cir.), rehearing den., 515 F.2d 510 (5th Cir. 1975), cert. den., 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975).

**12.** We note that the burden of showing that Kratzer failed to minimize his damages rests

with the defendant, Capital Marine Supply. See Tennessee Valley Sand & Gravel Co. v. M/V Delta, 598 F.2d 930, 933 (5th Cir.); reh. denied, 604 F.2d 13 (5th Cir. 1979).

**13.** Dr. Davidson wouldn't state definitively that losing weight would, as a reasonable certainty, aid the plaintiff: "I wouldn't say [losing weight] would help him, but you won't know until he loses the weight and finds out. I would hope that losing the weight would benefit him." (Trial p. 56). Cf. Garcia v. Bauer Dredging Company, Inc., 506 F.2d 19, 20 (5th Cir. 1975) (Injured plaintiff not required to undergo surgery in order to mitigate his damages where doctors indicated that surgery offered no reasonable certainty of success.)

program for 5 months, during which he reduced his weight to 265 pounds. Muller subsequently tired of the weight reduction program, discontinued treatment, and regained all his formerly lost weight. The court found that Muller had neglected his duty to minimize his damages.

In the present case, Kratzer was not placed on any doctor-administered weight reduction program. He was glibly told by his doctors that he should lose weight, although the benefits of which were uncertain.[14] Without more, we are unable to say that the defendant carried its burden in proving that Kratzer failed to mitigate his damages.

*Conclusion*

In summary, we find the district court was not in error in finding Kratzer 25% negligent and Capital Marine 75%, and that Kratzer was entitled to cure from a private physician under the circumstances. We therefore AFFIRM.

---

**14.** Of course, we do not intimate that noncompliance with a doctor-administered weight reduction program would automatically be grounds for either reducing or terminating maintenance and care payments. See, e. g., *Coulter v. Ingram Pipeline, Inc.*, 511 F.2d 735 (5th Cir. 1975).