UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 00-30724

_____


THE HOUSTON EXPLORATION COMPANY,

Plaintiff-Appellee,

V.

HALLIBURTON ENERGY SERVICES, INC.,

Defendant-Appellant,


_____

Appeal from the United States District Court
For the Eastern District of Louisiana

_____

October 22, 2001


Before DAVIS and JONES, Circuit Judges, and PRADO[*], District
Judge.

W. EUGENE DAVIS, Circuit Judge:

The Houston Exploration Company ("THEC") sued Halliburton

Energy Services, Inc. ("Halliburton") for damages incurred when

THEC's gas well blew out after Halliburton conducted drill stem

testing on the well.  At trial, Halliburton argued that it was

shielded from liability under an indemnity agreement between

Halliburton and THEC, which required THEC to release and

indemnify Halliburton.  Finding that Halliburton's conduct

_____

[*]District Judge of the Western District of Texas, sitting by
designation.

constituted gross negligence, the district court refused to enforce the indemnity agreement and entered a judgment for THEC. Halliburton now appeals, arguing that it was not grossly negligent, and thus, that the indemnity agreement should be enforced. Because we conclude that the district court clearly erred in finding that Halliburton's conduct amounted to gross negligence, we vacate the judgment of the district court and remand the case for further proceedings consistent with this opinion.

I.

The facts giving rise to this action are largely undisputed. THEC owned a natural gas well, known as Well C-1 ("the Well"), located on the Outer Continental Shelf in the Gulf of Mexico offshore of Louisiana, which blew out on May 31, 1997. Pursuant to a Work Order Agreement, THEC contracted with Halliburton to perform drill stem testing operations on the Well. Significantly, the Work Order Agreement required THEC "to defend, indemnify and hold Halliburton . . . harmless from and against any and all liability, claims, costs, expenses, attorney's fees and damages . . . resulting from . . . [l]oss of well control." The blowout that is the subject of this litigation occurred after Halliburton completed the third of three drill stem tests.

Drill stem testing entails perforating natural gas bearing formations at different depths in the well to determine at what

depth or depths the well should be completed.  One tool necessary for the test is a Halliburton tool known as an Internal Pressure Operating ("IPO") valve.  The IPO valve is a tubular tool fitted with one or more pins, which will shear when the variance between the internal pressure in the hollow core of the valve and the external pressure surrounding it reaches a preset differential.  Each pin is designed to shear at a pressure differential of 610 psi; thus, the total pressure differential required to open the ports is 610 psi multiplied by the number of pins.  When the IPO's pins shear, ports in the valve open, allowing the well fluid to circulate inside and outside the drill stem.  In this way, the IPO valve acts as a back-up circulating valve, which circulates mud or fluid through the well in the course of the well testing operations.  It is not designed to function as a well control device.

At the time of the blowout, Halliburton's practice was to ship IPO valves from its tool shop fitted with only one pin.  The Halliburton tool operator would then calculate the number of pins required for the job, open the valve, inspect it, and fit it with the correct number of pins.  In this case, Halliburton shipped three IPO valves to the rig: first, two valves with serial numbers 374 and 154, and later, a valve numbered 351.

The three well tests were conducted on May 21, 28, and 31, aboard the mobile drilling vessel PHOENIX II.  Wayne Lemaire was

the Halliburton tool operator for the first two tests. During the first test, the pins in IPO valve number 374 sheared. That valve could not be reused and was returned to Halliburton's on-shore shop to be redressed. As a result, Halliburton shipped valve number 351 as a replacement.

The second test was conducted on May 28, 1997. According to Halliburton's policy, Lemaire inspected valve number 351 and correctly fitted the valve with five pins. Lemaire did not record the serial number on the valve or mark it for identification. During a delay of several hours before the second test, the dressed valve was moved around the rig. When Lemaire gathered the tools for the second test, he realized that they had been moved. Without reopening the valve to determine whether it had been properly pinned, Lemaire picked up what he believed was the readied IPO valve and inserted it into the test string. Unfortunately, Lemaire erroneously installed the unprepared IPO valve number 154, which contained only one pin. Nevertheless, the second test was successfully completed.

Before the third test was run, Phillip Costlow, another Halliburton employee, replaced Lemaire as tool operator. Lemaire informed Costlow that the IPO valve already installed in the Well was properly pinned and ready for the third test. Relying on Lemaire's statements, Costlow did not disassemble the test string to reinspect the IPO valve and verify that it had been properly

pinned.

After the third test was completed and as the IPO valve was being removed from the test string, pressure in the Well created a kick. The drill crew brought the Well under control by tightening the connections on the IPO valve, thereby shutting in the Well. During this time, the IPO valve acted as a blowout preventer, a purpose for which it was not intended. Over the next one and a half hours, completion fluid was pumped into the well, causing the pressure to rise. As a result, the single pin in the IPO sheared unexpectedly, causing its ports to open and allowing a blowout of natural gas into the atmosphere. All personnel were safely evacuated from the rig.

It is undisputed that if the IPO had been pinned as intended, the blowout would not have occurred. After 19 days, the blowout was brought under control and the Well was placed into production.

## II.

THEC filed this suit against Halliburton, alleging that Halliburton was responsible for the blowout. At trial, Halliburton argued that the indemnity provisions of the Work Order Agreement protected Halliburton from liability. THEC maintained, however, that the indemnity agreement was unenforceable because Halliburton's conduct amounted to gross negligence. The district court agreed and entered a judgment in

favor of THEC.

Neither party disputes that a party's gross negligence defeats its right to enforce an indemnity contract of this kind.[1] The key issue Halliburton raises on appeal is simply whether the district court erred in finding that Halliburton's conduct amounted to gross negligence, thereby defeating its right to enforce the indemnity agreement.

## III.

In an admiralty case, as in other cases, we review a district court's findings of fact for clear error and its findings of law de novo.[2] A finding that a party is negligent or grossly negligent is a finding of fact and must stand unless clearly erroneous.[3] A finding of fact is "'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[4]

Under Louisiana law, contracts limiting liability are

---

[1] See La. Civ. Code Ann. art. 2004 (West 1987) ("Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party.").

[2] Fed. R. Civ. P. 52(a).

[3] Smyth v. Huff, 207 F.3d 758, 762 (5th Cir. 2000); Kratzer v. Capital Marine Supply, Inc., 645 F.2d 477, 480 (5th Cir. 1981); Tittle v. Aldacosta, 544 F.2d 752, 754 (5th Cir. 1977).

[4] United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

generally valid and enforceable.[5]  Any waiver of liability for intentional misconduct or gross negligence, however, is void.[6]

Under Louisiana law, gross negligence is willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence.[7]  We stated in Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc., that "[g]ross negligence is substantially and appreciable higher in magnitude than ordinary negligence."[8]  Other courts have defined gross negligence as the "entire absence of care,"[9] the "want of even slight care and diligence,"[10] and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of

_____

[5]    See, e.g., Nicor Supply Ships Assocs. v. General Motors Corp., 876 F.2d 501, 504 (5th Cir. 1989); Coastal Iron Works, Inc. v. Petty Ray Geophysical, 783 F.2d 577, 580-83 (5th Cir. 1986). The district court found that Louisiana law governs this case  pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a) (2001).  Because neither party challenges that  finding on appeal and because we find that the same outcome obtains whether Louisiana or maritime law applies, we adhere to the district court's finding and apply Louisiana law.

[6]    La. Civ. Code Ann. art. 2004; Sevarg Co. v. Energy Drilling Co., 591 So. 2d 1278 (La. Ct. App. 1991).

[7]    Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc., 922 F.2d 220, 224 n.3 (5th Cir. 1991).

[8]    Id.

[9]    Hendry Corp. v. Aircraft Rescue Vessels, 113 F. Supp. 198, 201 (E.D. La. 1953); see also Ambrose v. New Orleans Police Department Ambulance Service, 639 So. 2d 216, 219 (La. 1994).

[10]    State v. Vinzant, 200 La. 301, 315, 7 So. 2d 917, 922 (1942), quoting 18 Words & Phrases 723 (Perm. ed.); see also Ambrose, 639 So. 2d at 219.

others."[11]  At least one Louisiana court stated that one is grossly negligent when he "has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."[12]  Mere inadvertence or honest mistake does not amount to gross negligence.[13]

In this case, the district court found that Halliburton's conduct constituted gross negligence in two respects: (1) Lemaire's failure to verify that the valve he installed had been properly pinned; and (2) Costlow's subsequent failure to disassemble the test string and recheck Lemaire's work.

We turn first to the district court's determination that Lemaire was grossly negligent because he did not mark the IPO valve after pinning it, record its serial number, or reinspect the valve after it had been moved.  The record demonstrates that Lemaire properly inspected and pinned IPO valve number 351.  He then lost track of that tool after a member of the drill crew moved it.  Lemaire then erroneously substituted another

---

[11]  Hendry Corp., 113 F. Supp. at 201; see also Ambrose, 639 So. 2d at 219-20; Vinzant, 200 La. at 315, 7 So. 2d at 922.

[12]  Cates v. Beauregard Elec. Coop., 316 So. 3d 907, 916 (La. Ct. App. 1975), aff'd, 328 So. 3d 367 (La. 1976); see also Orthopedic & Sports Injury Clinic, 922 F.2d at 224 n.3.

[13]  See Orthopedic & Sports Injury Clinic, 922 F.2d at 224 n.3.

indistinguishable tool in the test string.  The record does not
support a finding that Lemaire had been instructed to mark or
record the serial number of tools that had been dressed.  The
district court was entitled to find that Lemaire's conduct was
negligent in failing to devise a method of distinguishing between
the dressed and undressed tools.  However, we conclude that the
record does not support a finding that Lemaire's conduct amounts
to a "want of even slight care and diligence,"[14] the most relaxed
definition of gross negligence the courts provide.

Moreover, the record does not support a finding that Lemaire
knew or should have known that a blowout might occur if the IPO
valve was not properly pinned.  As stated earlier, THEC personnel
tried to control the kick by using the IPO valve as a blowout
preventer.  The IPO valve is a back-up circulating valve designed
to circulate fluids in the well during drill stem testing if the
principal circulating valve, the OMNI valve, becomes inoperable.
It is not designed to function as a well control device.  In
addition, the record contains no evidence that a blowout has ever
resulted from a mispinned IPO valve.  A tool operator would
reasonably expect that an improperly pinned valve would result
only in a botched drill stem test, requiring the drill stem to be
removed from the well in order to replace the IPO valve.  The
record does not support a conclusion that an operator, such as

---

[14]     <u>Vinzant</u>, 200 La. at 315, 7 So. 2d at 922.

Lemaire, would anticipate that an improperly pinned valve would contribute to a well blow-out. On these facts, we conclude that the district court clearly erred in finding that Lemaire's conduct constituted gross negligence.

The district court also found that Costlow's failure to disassemble the test string and reinspect Lemaire's work amounted to gross negligence. Costlow's conduct presents an even weaker case for gross negligence than Lemaire's behavior. Costlow had no reason to believe that the IPO valve was not properly dressed. Costlow relied on Lemaire's statements that the IPO valve had already been pinned correctly. When Costlow relieved Lemaire as tool operator, the second test had already been successfully completed with the same IPO valve that is at issue in this case. Costlow had no reason to suspect that anything was wrong with the valve. Under these circumstances, the record clearly demonstrates that Costlow's conduct would at most support a finding of negligence. Thus, we hold that the district court also clearly erred in finding that Costlow's conduct amounted to gross negligence.

Our resolution of this appeal makes it unnecessary for us to consider a number of additional issues Halliburton raises in this appeal.

IV.

THEC argued in the district court that the indemnity

agreement on which Halliburton relies was not executed by an authorized representative of THEC, and therefore, that the contract is unenforceable.  Because the district court did not reach this issue, we must remand this case to the district court for its resolution.  Accordingly, we VACATE the judgment of the district court and REMAND the case to the district court for further proceedings consistent with this opinion.

VACATED AND REMANDED.