# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2013

No. 11-31117

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA, on behalf of Administrator of
Environmental Protection Agency,

Plaintiff-Appellant/Cross-Appellee

v.

CITGO PETROLEUM CORPORATION,

Defendant-Appellee/Cross-Appellant

Appeals from the United States District Court
for the Western District of Louisiana

Before JONES, BARKSDALE, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The United States brought suit against CITGO Petroleum Corporation, seeking civil penalties and injunctive relief under the Clean Water Act ("CWA"). After a bench trial, the district court imposed a $6 million penalty against CITGO and ordered injunctive relief. The United States appeals, arguing the amount of the penalty is inadequate. CITGO cross-appeals, arguing the district court lacked jurisdiction. There is jurisdiction, but we conclude the district court erred in failing to provide a reasonable approximation of economic benefit as required under the CWA and our caselaw. We VACATE the civil penalty award and REMAND for further proceedings.

No. 11-31117

## FACTS AND PROCEDURAL HISTORY

In 2006, a severe rainstorm caused two wastewater storage tanks at CITGO's Lake Charles, Louisiana refinery to fail. Over two million gallons of oil flooded into the surrounding waterways. The spill forced the closure of a nearby navigation channel for ten days, disrupting local businesses. Recreational activities on the impacted waterways were restricted for weeks following the spill. The spill also damaged over 100 acres of marsh habitat. Fish and other aquatic life were adversely impacted, and several birds were killed.

In April 2007, the Louisiana Department of Environmental Quality used its authority under state law to issue a compliance order, citing CITGO for violations of water quality laws as a result of the 2006 spill. The Department required corrective action and notified CITGO of the potential penalties it faced. Settlement discussions began, then were suspended due to an investigation being conducted by the federal Environmental Protection Agency.

In June 2008, the United States and Louisiana filed the present action in federal district court as co-plaintiffs. The United States sought civil penalties and injunctive relief under the CWA, and Louisiana sought penalties and costs as provided by the Louisiana Environmental Quality Act.[1] Louisiana amended its compliance order in July 2008, explaining that it now would pursue penalties against CITGO in federal court.

CITGO conceded liability. The district court held a two-week bench trial solely on the issue of damages. The court found that CITGO had failed to maintain its wastewater storage tanks properly and had allowed sludge and waste oil to accumulate in the tanks, lessening their capacity to accommodate stormwater. The court noted that CITGO violated its own standard operating procedures by allowing the tanks to become overburdened. Additionally, CITGO

---

[1] The district court awarded Louisiana $3 million in damages for CITGO's violation of state law. Louisiana is not a party in this appeal, and CITGO does not challenge the award.

2

No. 11-31117

was forced to make several unauthorized discharges of oily wastewater, totaling over 30 million gallons, into a surge pond to prevent the wastewater storage tanks from overflowing.

The district court concluded that CITGO's numerous failures amounted to ordinary negligence, rejecting the government's argument for a finding of gross negligence. The court noted that at the time of the spill, CITGO had designed a plan to address its overloaded storage tanks. Additionally, CITGO had taken steps to improve the plant, including the addition of a third wastewater storage tank, which was under construction at the time of the spill. Finally, the court recognized that an "exceptional amount of rain"– approximately 11 inches – had fallen on the day of the spill. The court reasoned that had the rainstorm not been so massive, the tanks likely would not have overflowed.

The court then considered the penalty factors of the CWA. *See* 33 U.S.C. § 1321(b)(8). It determined that CITGO should be penalized on a per-barrel basis under 33 U.S.C. § 1321(b)(7)(A). The court found that under "the totality of the circumstances," a per-barrel penalty of $111 was reasonable. It accepted CITGO's estimate that approximately 54,000 barrels of oil had spilled into the waterways and assessed a civil penalty of $6 million. The court also ordered extensive injunctive relief, which included the requirement that CITGO build a fourth storage tank.

## DISCUSSION

*I. Diligent Prosecution Bar*

CITGO argues the district court erred by denying its motion to dismiss for lack of jurisdiction, and urges this court to vacate the judgment and order the suit dismissed. What CITGO relies upon is a provision in the CWA precluding federal prosecution where "a State has commenced and is diligently prosecuting" an action under comparable state law. 33 U.S.C. § 1319(g)(6)(A)(ii). The United States argues Louisiana was not displaying diligence. If the bar is factually

inapplicable, it would not matter whether it is a jurisdictional bar. The district court made no fact findings on this question and, indeed, gave no explanation as to why the motion was denied.

As we noted already, in April 2007 the Louisiana Department of Environmental Quality issued a compliance order to CITGO for violations resulting from the oil spill and gave notice of potential penalties. The State and CITGO engaged in some settlement negotiations. According to a June 2008 internal Department memorandum, those negotiations were put on hold because of an EPA criminal investigation. When the complaint in the current suit was filed in June 2008, the state administrative action was pending but the attention being given to it was, at best, desultory. In July 2008, the State amended its compliance order, explaining that it intended to pursue monetary penalties for CITGO's violation of state law in federal court.

We cannot see diligence in these procedural steps. Little had occurred prior to the current suit being brought under the CWA. Nearly simultaneously with the filing of this suit, the State indicated it would no longer pursue with diligence or otherwise the comparable relief being sought administratively.

There was no diligent prosecution by the State and no jurisdictional issue to resolve. The motion to dismiss was properly denied.

*II. Civil Penalty*

The district court imposed a $6 million civil penalty on CITGO for its violation of the CWA. The United States had recommended a penalty of $247 million. On appeal, the United States argues the penalty is unreasonably low and inconsistent with the court's findings on the penalty factors. The United States also argues the district court failed to make necessary fact-findings on the amount of economic benefit to CITGO and erred in some of its other findings. Finally, it argues the district court should have found CITGO's inactions and delays in managing its wastewater system to be gross negligence.

No. 11-31117

The factors to be considered in awarding a civil penalty are identified in the CWA. A district court's analysis of those factors is highly discretionary. Despite this discretion, we conclude that the district court's failure to quantify the economic benefit to CITGO of deferring for nearly a decade its response to the known deficiencies at its Lake Charles plant requires reversal. As we will explain, because economic benefit serves as the starting point for calculating the civil penalty and is adjusted based on the remaining statutory factors, on remand the district court should consider its analysis of the factors afresh after making a reasonable approximation of economic benefit.

### A. Penalty Factors

The assessment of civil penalties under the CWA is left to the district court's discretion. The exercise of that discretion is guided by consideration of the following factors:

> the seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8). The Supreme Court has described the process of weighing the penalty factors as "highly discretionary." *Tull v. United States*, 481 U.S. 412, 427 (1987). We review factual findings in support of a district court's penalty calculation for clear error. *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 573 (5th Cir. 1996). A court's determination of the amount of a penalty to be assessed is reviewed under the highly deferential abuse-of-discretion standard. *Id.*

We find particularly instructive one of our precedents in which we reversed a district court's "highly discretionary" award of a civil penalty under

the CWA. *See United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996). We started with the observation that "calculation of discretionary penalties is not an exact science, and few courts could comply with [the defendant's] request that the importance of each factor be precisely delineated." *Id.* at 1338. We found an error in fact finding, then held that because the district court had failed to articulate with some precision how it had relied on different facts to compute the penalty, we needed to vacate and remand for the district court to calculate the fine again. *Id.* at 1339. We will explain why we find ourselves in an analogous position.

The economic benefit to CITGO that resulted "from the violation" is the critical factor in this appeal, critical in part because the district court made no finding on it. Though the "violation" in its most limited sense was the oil spill from which CITGO obtained no economic benefit, such a narrow reading of this statutory factor is inconsistent with the manner in which other courts have interpreted the requirement. Generally, courts consider the financial benefit to the offender of delaying capital expenditures and maintenance costs on pollution-control equipment. *See United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 530 (4th Cir. 1999); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1141 (11th Cir. 1990).

One court concluded that there are two general approaches to calculate economic benefit: "(1) the cost of capital, i.e., what it would cost the polluter to obtain the funds necessary to install the equipment necessary to correct the violation; and (2) the actual return on capital, i.e., what the polluter earned on the capital that it declined to divert for installation of the equipment." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 169 (3d Cir. 2004); *see also United States v. Mun. Auth. of Union Twp. (Dean Dairy)*, 150 F.3d 259, 266 (3d Cir. 1998) (noting that "methods other than the delayed or avoided capital expenditure for ascertaining economic benefit" have been used).

No. 11-31117

Besides the choices to make in calculating economic benefit, courts must also choose how to set the amount of the penalty:

> The CWA does not prescribe a specific method for determining appropriate civil penalties for violations. In *Dean Dairy,* we noted that some courts use the "top down" approach in which the maximum penalty is set ($25,000 per day of violation at the times relevant here), and reduced as appropriate considering the six enumerated elements of § 1319(d) as mitigating factors, while other courts employ the "bottom up" approach, in which economic benefit is established, and the remaining five elements of § 1319(d) are used to adjust the figure upward or downward. *Dean Dairy*, 150 F.3d at 265.

*Allegheny Ludlum*, 366 F.3d at 178 n.6. This circuit has never held that a particular approach must be followed, and we do not decide otherwise today. Regardless of the mathematics, we conclude that a district court generally must "make a 'reasonable approximation' of economic benefit when calculating a penalty under the CWA." *Cedar Point Oil*, 73 F.3d at 576.

We now examine what the district court decided here. It stated that the purpose of this penalty factor is to recoup any benefit gained by the polluter in failing to comply with the law, which indicates the court was defining the factor as do we. The court found that CITGO had decided to forgo certain maintenance projects that would have prevented the spill in an effort to minimize costs and increase profits. The court found, though, that the exact amount of cost savings was "almost impossible to determine" given the numerous and conflicting estimations of economic benefit presented by the parties at trial. Therefore, instead of quantifying the economic benefit, the court provided a range and found "the amount of [economic] gain to CITGO was less than the $83 million argued by the government, but more than the $719.00 asserted by CITGO."

We interpret these findings to have left economic benefit as a non-factor. Overall, the district court's failure to quantify economic benefit has made our review more difficult. Proper consideration of economic benefit is integral to

7

arriving at an appropriate damage award. Whether the economic benefit is a floor, adjusted by a court's analysis of the other factors, or helps determine how much to lower the ceiling established in other ways, it should not be ignored. In this case, based on CITGO's history of avoiding corrective actions for years, we find it particularly inappropriate not to have made an estimate, though admittedly difficult, of the economic benefit.

The remaining factors include the "seriousness of the violation." The district court found the spill was "massive," "excessive," and a "tragedy." Both parties agree with this assessment, as do we. The district court considered CITGO's "degree of culpability" and found that it was "fully at fault" for the spill and was negligent. The government points out that the CWA's penalty provision is a strict-liability provision and allows for the imposition of penalties up to $1,100/barrel even in the absence of negligence. *See* 33 U.S.C. § 1321(b)(7)(A) *and* 40 C.F.R. § 19.4 (adjusting civil penalties under CWA for inflation). Because CITGO was found to be negligent – a higher degree of culpability than strict liability – the United States argues that the district court's penalty of $111/barrel is unreasonable given that up to $1,100/barrel was authorized.

With respect to the fifth factor, "history of prior violations," the court found that CITGO had made unauthorized discharges of oily wastewater on at least six occasions prior to the spill and had been in violation of its permits for over 950 days. CITGO's history of violations, the district court found, reflected a lack of environmental responsibility and a general disregard of its duty to operate its business safely. According to the government, the district court's penalty of $111/barrel is clearly contrary to these findings. In light of our discussion of gross negligence below, the findings regarding this factor need to be re-evaluated on remand.

The United States claims the district court erred in relying on CITGO's efforts to minimize or mitigate the spill's effects – factor six – as a basis for

imposing a lower penalty.  CITGO estimated that it spent approximately $65 million in clean-up and response costs.  At the height of its response, CITGO had deployed 1,500 people; 60 miles of boom; vacuum trucks; skimmers; portable barges; and other clean-up equipment.  The district court acknowledged these efforts, but still found CITGO's first response to the spill "lacking."  There was evidence that CITGO, at least initially, failed to contain the spill and did not fully inform the Coast Guard of the severity of the spill.  Though there are different findings that could have been made, we do not discern any clear error in the facts found here or abuse of discretion in weighing this factor as the district court did.

The government also argues that the court placed too much emphasis on the eighth factor, which permits consideration of "any other matters as justice may require."  In analyzing this factor, the court noted that CITGO was a major employer in the Lake Charles community.  Additionally, as one of the largest refineries in the nation, the Lake Charles facility had a positive impact on the state's economy.  The court recognized the obvious negative impact the spill had on the community but concluded that it was only fair to view CITGO's role in the community as a whole, rather than limit its view to a single, extremely negative event.  According to the government, the fact that a polluter operates a large facility that benefits the local and state economies is not a basis for assessing a low penalty and contravenes the purpose of civil penalties under the CWA – punishment and deterrence.  We conclude that the district court's analysis of this factor was not clear error.

Finally, the government takes issue with the court's consideration of the injunctive relief ordered in assessing the penalty. While not addressed under its analysis of the factors, the court explained in the penalty section of its order that it had taken into account the injunctive relief ordered in determining that $111/barrel was an appropriate penalty.  As stated, the district court ordered

CITGO to construct a fourth wastewater storage tank.  The court also ordered CITGO to perform sediment sampling, to conduct a stormwater drainage calibration study, to repair and properly use the tanks' oil-skimming equipment, and to install other equipment designed to prevent future spills.  Evidently, the court reduced the civil penalty an unspecified amount based on the award of injunctive relief.  The district court's consideration of the cost of the injunctive relief does not strike us as clear error.

The district court needed to have made a finding on the amount of economic benefit.  We conclude such a finding is central to the ability of a district court to assess the statutory factors and for an appellate court to review that assessment.  We therefore vacate the civil penalty award and remand for re-evaluation.  Regardless of how the district court then exercises its discretion, within a top-down, a bottom-up, or some other analytical framework, the economic benefit factor creates a nearly indispensable reference point.  We have upheld some of the findings on various factors, and found error in others.  On remand, the district court may take a renewed look at all factors in light of the new findings on some.

### B.  Gross Negligence

Under the CWA, a court may impose a higher per-barrel civil penalty if the violation was "the result of gross negligence or willful misconduct."  33 U.S.C. § 1321(b)(7)(D).  According to the government, there was ample evidence presented at trial in support of CITGO's gross negligence.  Further, the government argues that the district court erroneously applied the state-law definition of gross negligence rather than the definition supplied by the CWA.

The district court began its analysis of gross negligence by stating "[u]nder Louisiana law, gross negligence is willful, wanton, and reckless conduct that falls between intent to do wrong and ordinary negligence."  This statement, the government argues, creates uncertainty as to whether the district court applied

the proper legal standard.  The government points out that the state-law definition equates gross negligence with willful misconduct, whereas the CWA uses those terms in the disjunctive.

"Gross negligence" is a label that straddles the divide between intentional and accidental actions.  The Louisiana Supreme Court has said that "often [there is] no clear distinction between such willful, wanton, or reckless conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning."  *Brown v. ANA Ins. Grp.,* 994 So. 2d 1265, 1269 n.7 (La. 2008) (quotations omitted).  We see no error in the district court's articulation of its understanding of this term that is neither fish nor fowl.  It does not appear that the district court relied on the state-law definition anyway.  After it offered the state-law definition of gross negligence, the district court stated that "it does not find that CITGO's actions or inactions rise to the level of gross negligence or willful misconduct" and "the Court finds no gross negligence or willful misconduct on the part of CITGO."  Given these subsequent statements, we conclude the district court applied the correct legal standard.

The government also contends that the district court's failure to find gross negligence is contrary to the overwhelming evidence of such negligence.  CITGO completed construction on a multi-million dollar wastewater treatment facility at its Lake Charles refinery in 1994.  According to CITGO, the facility was designed to withstand a "25-year/24-hour" storm (a storm of a strength seen only once in 25 years, lasting 24 hours).  By 1996, just two years after the facility's completion, a supervisor requested the construction of an additional storage tank, citing the inadequacy of the two existing storage tanks to accommodate stormwater.  The following year, a CITGO engineer warned: "Since the system is already marginal for stormwater capacity, it is imperative that excess oil and solids be removed so that this capacity can be used to store stormwater."

No. 11-31117

Despite this warning, CITGO failed to repair the oil-skimming system designed to remove floating waste oil. While CITGO employed other methods to remove waste oil from the tanks, such as using portable pumps, it had abandoned those methods by 2000. As a result, sludge and waste oil continued to accumulate in the tanks for years, causing the tank levels to rise and lessening their ability to accommodate stormwater.[2]

In 2002, CITGO employed an environmental consulting firm to evaluate the facility's stormwater capacity. The results of that study again called for the addition of a third storage tank. CITGO points out that it acted on this recommendation and constructed a third tank. It did not begin construction until 2005 – three years after receiving the recommendation – and it did not complete construction until 2007, which unfortunately was after the spill.

CITGO's own investigation of the spill revealed it had several "root causes." First, CITGO's wastewater treatment facility was inadequate to handle stormwater, a fact identified by the 2002 study. Second, CITGO did not have a procedure in place to monitor the amount of waste oil accumulating in the tanks. Third, CITGO failed to remove waste oil and sludge from the tanks on a regular basis.

Despite the above facts, all of which were put before the district court during a two-week bench trial through testimony from numerous witnesses and the introduction of hundreds of exhibits, the district court concluded in less than one page of analysis that CITGO was not grossly negligent. Not illogically, the district court credited CITGO for having undertaken, prior to the storm, the construction of the third storage tank. That tank, though, was not completed until more than a year after the storm. The district court found that prior to the

---

[2] CITGO's standard operating procedures required the contents of the tanks to be brought down to a level of 5.5 feet prior to a storm event. CITGO's corporate representative testified that at the time of the storm, the tanks' contents measured at 17 feet.

12

completion of the third storage tank, CITGO had made other improvements to the plant's functionality and capacity, including paving a dike around the storage tanks to contain overflows.  The court also referred to evidence that CITGO was working on a plan to remove the excess sludge from the tanks shortly before the spill; though it is unclear from the record what steps if any had been taken to implement the plan.   Finally, the court reasoned that even though the tanks were overburdened, it was unlikely that they would have overflowed had it not been for the excessive amount of rain that fell on the day of the spill.

A district court's "finding that a party is negligent or grossly negligent is a finding of fact and must stand unless clearly erroneous." *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 269 F.3d 528, 531 (5th Cir. 2001).  "A finding of fact is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*  In this case there is some evidence of CITGO's efforts to address the inadequacies of its wastewater storage tanks.  By finding nothing more than simple negligence, the district court discounted the seriousness of CITGO's multi-year wait before it began taking the corrective measures required at this plant.  In our view, though, almost winning a highly risky gamble with the environment does not much affect the egregiousness of having been gambling in the first place.

We have acknowledged the need to uphold the district court's findings unless clearly erroneous.  We make no ruling on this question now.  The category of negligence into which CITGO's conduct is placed is part of the overall analysis underlying the setting of the appropriate penalty.  Because of the conclusions we have already set out, the district court will have the obligation on remand to re-analyze the civil penalty award.  At that time, the district court should reconsider all its findings with respect to CITGO's conduct,

giving special attention to what CITGO knew prior to the oil spill and its delays in addressing recognized deficiencies.

### C. Penalty Calculation

The government raises two issues with respect to the district court's calculation of the civil penalty. First, it argues that the court erred in refusing to apply the "top-down" method of calculating the penalty. We have already answered that question. Second, it contests the court's use of CITGO's estimate of the amount of oil spilled in calculating the penalty.

On the question of how much oil was spilled, the district court accepted CITGO's estimation. After evaluating the methods of calculation used by the parties' experts, the court found CITGO's estimate of 54,000 barrels "more reasonable and credible" than the government's higher estimate of 76,800 barrels. The government's argument on this issue is essentially that the court credited the wrong expert. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258 (5th Cir. 2006). Consequently, we reject the government's argument that the district court erred with respect to its findings on the amount of oil spilled.

The district court's civil penalty is VACATED and this case is REMANDED for further consideration of the statutory penalty factors and its finding of negligence consistent with this opinion.