| | | |
|---|---|---|
| MONICA SEBBLE ON BEHALF OF THE ESTATE OF VIVIAN LEE BROWN (D) | * | NO. 2022-CA-0620 |
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| ST. LUKE'S #2, LLC D/B/A ST. LUKE LIVING CENTER; WOUND CARE ASSOCIATES, LLC; AND BRIDGEPOINT HEALTHCARE LA, LLC D/B/A BRIDGEPOINT CONTINUING CARE HOSPITAL | * | |
| | | STATE OF LOUISIANA |
| | * * * * * * * | |

| | |
|---|---|
| **CONSOLIDATED WITH:** | **CONSOLIDATED WITH:** |
| IN RE: MEDICAL REVIEW PANEL PROCEEDING OF VIVIAN LEE BROWN (D) | NO. 2022-CA-0621 |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2021-08529 C/W 2021-03362, DIVISION "B"
Honorable Richard G. Perque, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Paula A. Brown, Judge
Tiffany Gautier Chase)

Daniel Centner
Amanda Bensabat
PEIFFER WOLF CARR KANE CONWAY & WISE LLP
1519 Robert C. Blakes Sr. Drive
New Orleans, LA 70130

Kara Hadican Samuels
Amanda Francis
KARA HADICAN SAMUELS & ASSOCIATES, L.L.C.
4004 Canal Street
New Orleans, LA 70119

     COUNSEL FOR PLAINTIFF/APPELLEE
Guice A. Giambrone, III

Bert J. Miller
BLUE WILLIAMS, LLP
3421 North Causeway Boulevard
Suite 900
Metairie, LA 70002

COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**
**MARCH 06, 2023**

This appeal involving a medical malpractice claim presents an issue of first impression for this Court.  Appellant, Bridgepoint Healthcare LA, LLC d/b/a Bridgepoint Continuing Care Hospital ("Bridgepoint"), appeals the district court's July 5, 2022 judgment,[1] declaring that La. R.S. 29:771(B)(2)(c),[2] which provides immunity from civil liability for health care workers during a state of public health emergency, shall not be considered or applied in the medical review panel proceeding commenced by Appellee, Monica Sebble on behalf of the estate of Vivian Lee Brown ("Ms. Sebble").  For the reasons that follow, we affirm the district court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

On November 21, 2019, Vivian Lee Brown ("Ms. Brown") was admitted as a resident to St. Luke's Living Center ("St. Luke's"), a skilled nursing facility located in New Orleans, Louisiana.  Ms. Brown presented with a variety of

---

[1] The judgment was rendered on the cross motions for summary judgment filed by Bridgepoint and Ms. Sebble—Bridgepoint sought a declaration that La. R.S. 29:771(B)(2)(c) must be considered and applied in the pending medical review panel proceeding, while Ms. Sebble sought a declaration that La. R.S. 29:771(B)(2)(c) cannot be considered or applied in the pending medical review panel proceeding.  The district court granted summary judgment in favor of Ms. Sebble's motion and Bridgepoint's motion was denied.

[2] La. R.S. 29:771(B)(2)(c), which was in effect at the time of the alleged malpractice, will be more fully discussed in detail, *infra*.

1

medical diagnoses, which included: diabetes, seizure disorder, dementia, congestive heart failure and atrial fibrillation. Because of her limited mobility, Ms. Brown faced a substantial risk of developing pressure ulcers, known colloquially as bed sores. In fact, when Ms. Brown was subsequently transferred to East Jefferson General Hospital ("EJGH") for an altered mental status on December 29, 2019, she had already developed a stage 2-3 pressure ulcer in the sacral area in addition to a urinary tract infection. After receiving treatment at EJGH, Ms. Brown returned to St. Luke's on January 2, 2020, at which time the pressure ulcers had already begun to show signs of healing.

Not long afterwards, COVID-19 infections began to rise at an alarming rate around the world, and on March 11, 2020, the World Health Organization ("WHO") declared COVID-19 a pandemic. Also on March 11, 2020, under the powers granted by the Louisiana Health Emergency Powers Act (the "LHEPA"),[3] Governor John Bel Edwards declared a state of public health emergency due to the potential for the rapid spread of COVID-19 throughout the State.[4]

On May 29, 2020, Ms. Brown was once again admitted to EJGH. At some point prior to arriving at EJGH, Ms. Brown stopped eating, became dangerously dehydrated and was showing signs of severe malnourishment. By the time Ms. Brown was transferred to EJGH, she had developed stage 4 pressure ulcers that had become so severe that Ms. Brown's bones had become exposed. Because the

_____

[3] The LHEPA, codified in La. R.S. 29:760, et seq., will be more fully discussed, *infra*.

[4] Proclamation Number 25 JBE 2020, which declared that "[p]ursuant to the Louisiana Health Emergency Powers Act, La. R.S. 29:760, et seq., a statewide public health emergency is declared to exist in the State of Louisiana as a result of the imminent threat posed to Louisiana citizens by COVID-19, which has created emergency conditions that threaten the lives and health of the State." This emergency declaration was renewed on a monthly basis until it was allowed to expire on March 16, 2022.

flesh surrounding the pressure wounds was deemed to be necrotic, Ms. Brown underwent surgery on June 6, 2020, at which time the pressure wounds were debrided to the bone.

Ms. Brown was discharged from EJGH on June 17, 2020, and was transferred to Bridgepoint. Upon arrival at Bridgepoint, Ms. Brown, who was still suffering from multiple stage 4 pressure ulcers, had become severely anemic and required the use of a feeding tube. One week later, on June 24, 2020, Ms. Brown suffered cardiopulmonary arrest and was transferred to West Jefferson Medical Center, where she died on the same day. An autopsy was requested by Ms. Sebble (Ms. Brown's granddaughter and executrix of her estate) that revealed Ms. Brown aspirated food particles, which was alleged to have occurred while she was under the care of Bridgepoint.

In accordance with the procedural directives set forth in the Louisiana Medical Malpractice Act ("LMMA"),[5] Ms. Sebble filed a request for a medical review panel with the Louisiana Patient's Compensation Fund (the "PCF") on March 31, 2021. Ms. Sebble alleged that Bridgepoint and the other named defendants negligently breached the standard of care in their treatment of Ms. Brown, which ultimately caused her untimely death. On April 19, 2021, Ms. Sebble filed a petition to institute discovery on the underlying malpractice claim in Orleans Civil District Court. Ms. Sebble filed a petition for declaratory judgment on October 21, 2021, seeking to have the district court declare that the qualified immunity extended to health care workers during a state public health emergency under La. R.S. 29:771(B)(2)(c) was inapplicable at the medical review panel stage.

---

[5] The LMMA, codified under La. R.S. 40:1231.1, et seq., will be more fully discussed, *infra*.

Ms. Sebble contended that the attorney chair should be precluded from instructing the panel members to consider gross negligence when determining whether the defendants had breached the ordinary negligence standard of care in their treatment of Ms. Brown. In turn, Bridgepoint filed an answer and reconventional demand to Ms. Sebble's petition for declaratory judgment on December 13, 2021, denying the allegations and requesting that the district court issue a declaratory judgment finding the modified standard of gross negligence found in La. R.S. 29:771(B)(2)(c) should be applied at the medical review panel stage.

Ms. Sebble and Bridgepoint filed cross-motions for summary judgment relating to their competing requests for a declaratory judgment on April 29, 2022, and May 2, 2022, respectively. The motions came for hearing before the district court on June 29, 2022. After considering the law and arguments of counsel, the district court granted Ms. Sebble's motion for summary judgment and denied Bridgepoint's motion. This timely appeal followed.

## STANDARD OF REVIEW

"It is well-settled law that '[t]his Court reviews the granting of '[a] summary judgment on appeal *de novo*, using the same criteria that govern the [district] court's determination of whether summary judgment is appropriate.'"" *Johnson v. Palazzo*, 22-0502, p. 3 (La. App. 4 Cir. 12/7/22) 353 So.3d 1022, 1023, (quoting *Cooper v. Brisco*, 22-0196, p. 4 (La. App. 4 Cir. 10/18/22), ___ So.3d ____, ____, 2022 WL 10320651 at *2).

Furthermore, "La. C.C.P. art. 1871 provides that '[c]ourts of record within their respective jurisdictions may declare rights, status, and other legal relations whether or not further relief is or could be claimed.'" *Robin v. Creighton-Smith*, 21-0737, p. 4 (La. App. 4 Cir. 5/11/22) 340 So.3d 174, 178. "La. C.C.P. art. 1876

4

provides that '[t]he court may refuse to render a declaratory judgment or decree where such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding.'" *Id.* "'It is well settled that with regard to the standard of review of a declaratory judgment action that '[o]n appeal, the scope of appellate review is confined to a determination of whether or not the trial court abused its discretion by granting or refusing to render a declaratory judgment.'" *Id.* (citing *Battle v. Watson Invs., Inc.*, 06-0202, pp. 2-3 (La. App. 4 Cir. 11/21/06), 946 So.2d 226, 228). "Moreover, the Louisiana Supreme Court has held that '[t]rial courts are vested with wide discretion in deciding whether to grant or refuse declaratory relief.'" *Id.* at p. 4, 340 So.3d at 178-179 (quoting *Louisiana Supreme Court Committee on Bar Admissions ex rel. Webb v. Roberts*, 00-2517, p. 3 (La. 2/21/01), 779 So.2d 726, 728).

Notwithstanding, "[a]lthough [a] decision is subject to an abuse of discretion standard of review, the judgment itself is still reviewed under the appropriate standard of review. Thus, questions of law are reviewed *de novo*, while questions of fact are subject to a manifest-error standard of review." *Id.* at pp. 4-5, 340 So.3d at 179 (citing *Westlawn Cemeteries, L.L.C. v. Louisiana Cemetery Bd.*, 21-01414, 2022 WL 883914, at *11-12 (La. 3/25/22)). Because the matter before this Court involves the interpretation of statutory provisions and only questions of law are presented, our review is *de novo*.

## DISCUSSION

The issue presented for this Court's review is whether La. R.S. 29:771(B)(2)(c) is a modified standard of care, which should be considered and applied during the medical review panel proceeding, or whether it is an immunity statute, which can only be raised as an affirmative defense. Before we address the

5

merits of Bridgepoint's arguments, we find it necessary to examine both the LMMA and LHEPA in order to provide a framework for our analysis.

*Applicable Law*

This Court recently explained that "[t]he starting point in the interpretation of any statute is the language of the statute itself." *Lepine v. Dep't of Wildlife & Fisheries*, 22-0160, p. 5 (La. App. 4 Cir. 10/5/22), 350 So.3d 988, 992 (quoting *Whitley v. State ex rel. Bd. of Sup'rs of La. State Univ. Agric. Mech. Coll.*, 11-0040, p. 6 (La. 7/1/11), 66 So.3d 470, 474). "It is axiomatic that when statutory language is troublesome, i.e. ambiguous, it falls to the courts to parse their meaning." *Id.* "As the Supreme Court articulated in *Pierce Founds., Inc.*, 15-0785, p. 6, 190 So.3d at 303, '[l]egislation is the solemn expression of the legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent.'" *Id.* *See also* La. R.S. 24:177(B)(1). "However, '[w]hen a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.'" *Id.*, at p. 6, 350 So.3d at 992 (quoting La. C.C. art. 9). "Similarly, '[w]hen the wording of a section of the revised statutes is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit.'" *Id.* (quoting *Whitley*, 11-0040, p. 6, 66 So.3d at 474). "Words and phrases shall be read with their context and shall be construed according to the common and approved usage of the language." *Id.* (quoting La. R.S. 1:3). "Nevertheless, '[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.'" *Id.* (quoting La. C.C. art. 10). "Additionally, '[w]hen the words of a law are ambiguous, their meaning must be sought by examining the

6

context in which they occur and the text of the law as a whole.'" *Id.* (quoting La. C.C. art. 12).

*Louisiana Medical Malpractice Act*

"In response to a perceived crisis in this state caused by prohibitive costs in connection with medical malpractice insurance, our Legislature enacted the [L]MMA in 1975, with the intended purposes of reducing or stabilizing medical malpractice insurance rates and ensuring the availability of affordable medical services to the general public." *McGlothlin v. Christus St. Patrick Hosp.*, 10-2775, p. 7 (La. 7/1/11) 65 So.3d 1218, 1225 (citing *Spradlin v. Acadia-St. Landry Medical Foundation*, 98-1977, p. 6 (La. 2/29/00), 758 So.2d 116, 120). "In order to achieve these ends, the [L]MMA provided qualified health care providers with a number of advantages in derogation of the general rights of tort victims." *Id.* (citing *Galloway v. Baton Rouge General Hosp.*, 602 So.2d 1003, 1005-06 (La. 1992); *Everett v. Goldman*, 359 So.2d 1256, 1262-63 (La. 1978)). Specifically, La. R.S. 40:1231.8(A)(1)(a) mandates that "[a]ll malpractice claims against health care providers covered by this Part, other than claims validly agreed for submission to a lawfully binding arbitration procedure, shall be reviewed by a medical review panel. . . ." "The medical review panel shall consist of three health care providers who hold unlimited licenses to practice their profession in Louisiana and one attorney." La. R.S. 40:1231.8(C). "The panel shall have the sole duty to express its expert opinion as to whether or not the evidence supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care." La. R.S. 40:1231.8(G)

The purpose behind this statutory scheme was outlined by the Louisiana Supreme Court in *Everett v. Goldman*:

7

> Pretrial screening through a medical review panel is designed to weed out frivolous claims without the delay or expense of a court trial. It is thought that the use of such panels will encourage settlement because both parties will be given a preliminary view of the merits of the case. If a claim is found by the panel to be without merit it is thought that the claimant will be likely to abandon his claim or agree to a nominal settlement. Moreover, a plaintiff who gains a favorable opinion from the panel may be able to negotiate a favorable settlement with his defendants, a procedure which also avoids much of the time and expense of a trial. Thus, to the extent that the use of medical review panels encourages settlement of suits before trial, litigation costs will probably be reduced. Because out of court settlements usually do not garner the publicity of jury verdicts it is also hoped by proponents of the legislation that publicity concerning the award figure will be minimal and that this fact will gradually reduce awards granted by juries. Additionally since jury awards are believed generally to be larger than settlements, the increase in prevalence of the latter should serve to reduce the overall payment of claims. Thus, litigation costs and actual awards are expected to be lessened by virtue of the employment of pre-suit medical review panels.

*Everett*, 359 So.2d at 1256, 1264 (citations omitted).

*Louisiana Health Emergency Powers Act*

In 2003, the Louisiana Legislature enacted a comprehensive revision to the Louisiana Emergency Assistance and Disaster Act of 1993 via Senate Bill 908, passed into law under Acts 2003, No. 1206, § 1. This revised set of statutes was entitled the Louisiana Health Emergency Powers Act, codified in La. R.S. 29:760 through 772. It was explained on the floor of the House of Representatives that this legislation was proposed in response to the tragic events of September 11, 2001,[6] and that SB 908 was based on a model act.[7] La. R.S. 29:766(A) provides

---

[6] A video recording of the June 19, 2003 House Chamber session is available at: https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2003/JUN/0619_03_Day45_2003RS_P2 - discussion begins at 1:54:47.

[7] The Model State Emergency Health Powers Act was promulgated at the request of the Center for Disease Control and Prevention, drafted by the Center for Law and the Public's Health at Georgetown and Johns Hopkins Universities and offered on December 21, 2001. L. Christine Tillman, *The Louisiana Health Emergency Powers Act: What Would the Louisiana Supreme Court Say?*, 49 S.U. L. Rev. 303, 309 (Spring 2022).

that "[a] state of public health emergency may be declared by executive order or proclamation of the governor, following consultation with the public health authority, if he finds a public health emergency as defined in R.S. 29:762[8] has occurred or the threat thereof is imminent." La. R.S. 29:771 further sets forth private liability immunity during a declared state of public health of emergency. Pertinently, La. R.S. 29:771(B)(2)(c) provides that "[d]uring a state of public health emergency, any health care providers shall not be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct."[9]

With these precepts in mind, we now turn to the issue before this Court.

*Modified Standard of Care*

---

[8] La. R.S. 29:762 provides, in pertinent part:
> (12) A "public health emergency" means an occurrence or imminent threat of an illness or health condition that:
> (a) Is believed to be caused by any of the following:
> (i) Bioterrorism.
> (ii) The appearance of a novel or previously controlled or eradicated infectious agent or biological toxin.
> (iii) A disaster, including but not limited to natural disasters such as hurricane, tornado, storm, flood, high winds, and other weather related events, forest and marsh fires, and man-made disasters, including but not limited to nuclear power plant incidents or nuclear attack, hazardous materials incidents, accidental release or chemical attack, oil spills, explosion, civil disturbances, public calamity, hostile military action, and other events related thereto.
> (b) Poses a high probability of any of the following harms:
> (i) A large number of deaths in the affected population.
> (ii) A large number of serious or long-term disabilities in the affected population.
> (iii) Widespread exposure to an infectious or toxic agent that poses a significant risk of substantial future harm to a large number of people in the affected population.

[9] La R.S. 29:771 was amended via Acts 2020, 2nd Ex. Sess., No. 30, §1, eff. Oct. 28, 2020, in which the statute at issue in the case *sub judice* was re-designated as LA. R.S. 29:771(B)(2)(c)(i). The language of this statute was also slightly modified for clarity, and now provides that "[d]uring a state of public health emergency, no health care provider shall be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct."

Bridgepoint contends that by virtue of the emergency declaration,[10] gross negligence, the modified standard of care found in La. R.S. 29:771(B)(2)(c), is automatically triggered and supersedes the more general negligence standard of care ordinarily used in a medical review panel proceeding. Bridgepoint posits, that to prohibit the attorney chairperson from advising the panel members regarding the law on gross negligence, would fly in the face of the directives of La. R.S. 40:1231.8(D)(5), which sets forth that "[t]he chairman of the panel shall advise the panel relative to any legal question involved in the review proceeding. . . ." Bridgepoint contends that such a prohibition would necessarily impede the panel members and the chairperson from fulfilling their required oaths as provided for under La. R.S. 40:1231.8(C)(5)(a)[11] and 40:1231.8(C)(5)(b).[12]

In counterpoint, Ms. Sebble argues that there is a distinction between the medical standards of care and legal standards of care, and that the medical review panel is only qualified to render an opinion based upon the medical standard of care. In support, Ms. Sebble first cites to La. R.S. 40:1231.8(C)(3)(j) which provides, in pertinent part, that "all panelists. . . shall be from the same class and specialty of practice of health care provider as the defendant." Further, in accordance with La. R.S. 40:1231.8(G) and 40:1231.8(N)(6), "[t]he panel shall have the sole duty to express its expert opinion as to whether or not the evidence

---

[10] It is undisputed by either party that Ms. Sebble's treatment at Bridgepoint occurred during that time when the LHEPA was in effect as a result of Governor Edwards' emergency declaration.

[11] The oath taken by the panelists as contained in La. R.S. 40:1231.8(C)(5)(a) provides, in pertinent part that "it is my lawful duty to . . . render a decision in accordance with law and the evidence."

[12] The oath taken by the chairperson delineated in La. R.S. 40:1231.8(C)(5)(b) provides, in pertinent part that "it is my lawful duty to advise the panel members concerning matters of law and procedure and to serve as chairman."

supports the conclusion that the defendant or defendants acted or failed to act within the appropriate standards of care." Ms. Sebble contends that neither the review panelists nor the attorney chairs are trained to compare and contrast "negligent" care within the panelists' specialties with "grossly negligent" care, and such determination should be left to the judge or jury.

Bridgepoint, in support of its contention, cites to *Lejeune v. Steck*, 13-1017 (La. App. 5 Cir. 5/21/14) 138 So.3d 1280. That case involved allegations of medical malpractice that occurred during a declared state of public health emergency in the aftermath of Hurricane Katrina. The *Lejeune* court reasoned that when applying the well-established rules of statutory construction, "when two statutes deal with the same subject matter, if there is a conflict, the statute specifically directed to the matter at issue must prevail as an exception to the statute more general in character." *Id.* at p.6, 138 So.3d at 1284 (quoting *Burge v. State*, 10-2229, p. 5 (La.2/11/11), 54 So.3d 1110, 1113). "Furthermore, the burden of proof set forth in La. R.S. 29:771 relative to medical malpractice during a declared state of medical emergency prevails over the more general medical malpractice statutes." *Id.* The Fifth Circuit affirmed the district court's judgment, which granted defendant's motion for summary judgment and found that the plaintiff had failed to provide an expert witness to support her burden of proof of gross negligence or willful misconduct at trial.[13] *See Lejeune*, 13-1017, p. 9, 138 So.3d at 1286.

Bridgepoint points out that when rendering its opinion, the medical review panel in *Lejeune* declared "that the prevailing standard of care was that set forth in La. R.S. 29:771[(B)](2)(c), and that there was no evidence of gross negligence or

---

[13] The Supreme Court denied writs. *See Daigle v. Steck*, 14-1408 (La. 10/3/14) 149 So.3d 800.

11

willful misconduct." *Id.* at p. 3, 138 So.3d at 1282. However, we find this case to be unpersuasive. Our reading of *Lejeune* reflects that the reviewing court did not offer any opinion as to the correctness of the medical review panel's consideration of La. R.S. 29:771; rather, the court simply stated that the panel had used the statute in its determination.

Bridgepoint further directs our attention to an unreported Fifth Circuit opinion, *In re Welch*, 21-624, 2022 WL 242683 (La. App. 5 Cir. 1/26/22). The appellate court in that case denied writs and upheld the district court's judgment that found the attorney chairman "has the duty to provide legal advice to the panel and to advise them on what standards of care may be applied and is ordered to consider the governor's order and any and all other case law that he or she may be instructive on what standard of care to apply in this case." *Id.* at p. 3, 2022 WL 242683 at *3. Bridgepoint specifically points to the concurrence written by Judge Windhorst, wherein he opined, in part:

> [W]hen the provisions of La. R.S. 29:771 B(2)(c)(i) apply, as in this case, the law requires that the panel determine whether the deviation from the appropriate medical standard of care was one of gross negligence or willful misconduct. The medical review panel cannot make the proper determination as required by this statute unless it is properly instructed by its attorney chairman that, in this case, because a "state of public health emergency" was declared by the Governor, the law requires that the panel determine whether the deviation from the appropriate medical standard constitutes gross negligence or willful misconduct.

*Id.* at p. 7, 2022 WL 242683 at *6.

We respectfully disagree. First, we note that "the decisions of other circuits are not binding on this Court and are persuasive authority only." *Shelton v. Pavon*, 16-0758, p. 8 (La. App. 4 Cir. 2/15/17) 212 So.3d 603, 609. Second, our review of the applicable statutes reveals that they are silent as to whether it is suitable for a

12

medical review panel to consider gross negligence or willful misconduct. Moreover, adhering to our rules of statutory construction and being mindful that the LMMA is to be strictly construed, we conclude that the legislature has evinced an intent to have medical experts render an opinion according to their medical expertise, not their legal expertise.[14] It is for this reason that the continuation of a malpractice claim post-panel is conducted under the purview of the courts in a judicial proceeding. As such, we find the more informative segment of Judge Windhorst's concurrence to be that portion which reasoned that "[t]he *medical* standard of care is wholly distinct from the *legal* standard or evidentiary showing which must be met in a medical malpractice case." *In re Welch* at p. 7, 2022 WL 242683 *6 (citing *Perritt v. Dona*, 02-2601 (La. 7/2/03) 849 So.2d 56 (emphasis in original).[15]

Based on the reasons set forth below, we find gross negligence and willful misconduct to be legal standards reserved for a determination by the trier of fact. In particular, our research into the jurisprudence surrounding gross negligence finds this nebulous concept to be one that has proven troublesome amongst the

---

[14] La. R.S. 9:2794(A)(1) states, in pertinent part:

> A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:
> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

[15] Judge Windhorst ultimately concluded that it was the duty of the chairperson to advise the panel as to both standards of care. We disagree with this conclusion for the reasons espoused in this opinion.

various courts. Despite pronouncements to the contrary, its definition remains far from precise. It is for this reason that the Louisiana Civil Law Treatise warns that "[d]efining gross negligence is a true logomachy,[16] better avoided were it not for Louisiana statutes which impose liability on certain actors only if gross negligence rather than ordinary negligence is proven." H. Alston Johnson, III, *Civil Jury Instructions, in* 18 LOUISIANA CIVIL LAW TREATISE § 3:13 (3d ed. 2022).

This Court has found that "[g]ross negligence has a well-defined legal meaning, which is distinctly different from the definition of ordinary negligence." *Powell v. State Board of Certified Public Accountants of Louisiana*, 21-0385, p. 18 (La. App. 4 Cir. 12/22/21) ___ So.3d ____, ____, 2021 WL 6064833 at *8 (quoting *Brown v. Lee*, 05-1302, p. 5 (La. App. 4 Cir. 4/5/06), 929 So.2d 775, 778). The *Powell* Court also explained that "[g]ross negligence has been defined as the want of even slight care and diligence and the want of that diligence which even careless men are accustomed to exercise." *Id.* Willful misconduct is defined as "[m]isconduct committed voluntarily and intentionally."[17] And this Court has held that "[t]he type of behavior which is considered 'willful misconduct' is intentional wrong behavior. *Brandon v. Lockheed Martin Corp.*, 03-1917, p. 10 (La. App. 4 Cir. 4/14/04) 872 So.2d 1232, 1240 (citing *Banks v. Administrator of Employment Security*, 393 So.2d 696 (La.1981)).

When seeking to apply the provisions of La. R.S. 29:771(B)(2)(c)(i), the Second Circuit Court reasoned that "gross negligence has been described as an extreme departure from ordinary care or the want of even scant care. *Lathon v.*

---

[16] The Meriam-Webster Dictionary defines logomachy as: "(1) a dispute over or about words; or (2) a controversy marked by verbiage."

[17] Black's Law Dictionary (11th ed. 2019).

*Leslie Lakes Retirement Center*, 54,479, p. 5 (La. App. 2 Cir. 9/21/22) 348 So.3d 888, 891 (quoting *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So. 2d 216) *There is often no clear distinction between . . . willful, wanton, or reckless . . . conduct and gross negligence, and the two have tended to merge and take on the same meaning.*" *Id.* (emphasis in original) (*See also Rabalais v. Nash*, 06-999, p. 6 (La. 3/9/07) 952 So.2d 653, 658, wherein the Supreme Court found that "[t]here is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning"). "Additionally, the language emphasized in the above quote from *Ambrose* makes clear that the concept of gross negligence subsumes willful, wanton, and reckless misconduct." *Lathon,* 54,479, p. 5, 348 So.3d at 891.

In *McQuirter v. State*, the Supreme Court was tasked with determining whether conduct rose to the level of willful misconduct. Finding instead that the conduct was ordinary negligence, the Court opined that "'[t]he terms 'willful', 'wanton', and 'reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended.'" *McQuirter v. State Through Louisiana Dep't of Pub. Safety & Corr. Elayn Hunt Correctional Center, et al.*, 20-01192, p. 2 (La. 1/12/21) 308 So.3d 285 (quoting *Koonce v. St. Paul Fire & Marine Ins. Co*, 172 So. 3d at 1106). "Only the most egregious conduct . . . that exhibits an active desire to cause harm, or a callous indifference to the risk of potential harm from flagrantly bad conduct, will rise to the level of

15

willful misconduct." *Id.* at p. 2, 308 So.3d at 285-286 (quoting *Haab v. East Bank Consol. Special Service Fire Protection Dist. of Jefferson Parish*, 13-954, p. 10 (La. App. 5 Cir. 5/28/14), 139 So. 3d 1174, 1182).

The federal Fifth Circuit Court of Appeals also weighed in on the issue when it found that "[u]nder Louisiana law, gross negligence is willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence." *Houston Exploration Co. v. Halliburton Energy Services, Inc.*, 269 F.3d 528, 531 (5th Cir. 2001) (citing *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220, 224 n. 3 (5th Cir. 1991)). The *Houston Exploration* court went on to add that "[a]t least one Louisiana court stated that one is grossly negligent when he 'has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'" *Id.* at 532 (quoting *Cates v. Beauregard Elec. Co-op., Inc.*, 316 So.2d 907, 916 (La. Ct. App. 1975), *aff'd*, 328 So.2d 367 (La. 1976)).[18]

Widening our view beyond Louisiana jurisprudence, we find that "[g]enerally, the modern concept of gross negligence has two requirements or components: (1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) the actor must have actual, subjective awareness of the risk involved, but nevertheless proceed with conscious indifference to the rights, safety, or welfare of others."[19] Stuart M. Speiser et al., 3

---

[18] *See also Franklin v. Regions Bank*, No. CV 5:16-1152, 2021 WL 786002, at *4 (W.D. La. Mar. 1, 2021).

American Law of Torts § 10:16 (March 2023). "In the context of the 'gross negligence' two components or requirements, 'extreme risk' means not a remote possibility of injury, or even a high probability of minor harm, but the likelihood of serious injury to the plaintiff, and 'actual awareness' means that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care." *Id*.

Further, "it has been said the difference between negligence and gross negligence is not in the degree or magnitude of inadvertence or carelessness; gross negligence is intentional wrongdoing or deliberate misconduct affecting the safety of others." Stuart M. Speiser et al., 3 American Law of Torts § 10:17 (March 2023). "An act or conduct rises to the level of gross negligence when the act is done purposely and with knowledge that it is a breach of duty to others—i.e., a conscious disregard of the safety of others." *Id*. "What separates ordinary negligence from gross negligence is the defendant's state of mind." *Id*.

Hence, our review of the jurisprudential history regarding gross negligence and willful misconduct leaves us inclined to agree with the dissenting opinion in *Whitehead* in which it was proffered that "the law has established that the meaning of the words 'gross negligence,' 'willful' and 'intentional' **apply the same**. *Whitehead v. Christus Health*, 21-764, pp. 3-4 (La. App. 3 Cir. 6/8/22) 344 So.3d 91, 98.[20] (emphasis in original). Because the LMMA defines malpractice as "any

---

[19] *See also* H. Alston Johnson, III, *Civil Jury Instructions, in* 18 LOUISIANA CIVIL LAW TREATISE § 3:13 (3d ed. 2022) where gross negligence is defined as "the absence of even slight care and diligence, suggesting that the conduct was the result of a conscious indifference to the safety of the person or persons to be affected by the conduct."

[20] In *Whitehead*, the plaintiffs filed a request for a medical review panel and filed a medical malpractice claim in the district court on the same day, in which they alleged acts of gross negligence and willful misconduct. The defendants filed exceptions of prematurity based upon the requirement of the LMMA that all medical malpractice claims must first be submitted to a

unintentional tort or any breach of contract based on health care or professional services rendered,"[21] we find that it would be wholly inappropriate for the panel members to receive any instruction pertaining to gross negligence, which would inherently include intentional acts.

Moreover, we find that the complexity of the legal concept of gross negligence dictates that its definition and applicability remain within the province of the trier of fact. This view was enunciated by the Supreme Court in *Derouen v. Kolb*, 397 So.2d 791, 794 (La. 1981), wherein the court explained that "[w]here a judge has the power to decide the facts and law of a case and to render a final adjudication as to the rights of the parties involved, no such power exists for the medical review panel. The panel simply renders an expert opinion, and does not have the power to adjudicate the rights of any party." *Id.* "Further, we reaffirm our decision in [*Everett*] and find the medical review panel is not a judge nor a jury, but merely a body of experts assembled to evaluate the plaintiff's claim and to provide the courts and the parties with an expert opinion." *Id.*, at 794-795 (citing *Everett* 359 So.2d 1256 (La. 1978)).

This approach juxtaposes nicely when measured against the kinds of evidence a medical review panel may review before it renders an opinion. La. R.S. 40:1231.8(D)(1) directs that "[t]he evidence to be considered by the medical review panel shall be promptly submitted by the respective parties in written form only." In other words, the panel is not permitted to examine live witnesses, which

---

medical review panel before a suit may be filed. The plaintiffs argued that because they had alleged gross negligence and willful misconduct, there was no need for a medical review panel prior to the filing of their civil suit. On appeal, the Third Circuit court found that because the underlying claim sounded in medical malpractice, it was necessary for the plaintiffs to submit to a medical panel review proceeding prior to filing suit.

[21] La. R.S. 40:1231.1.

we find to be a crucial step in determining whether a defendant's actions rise to the level of gross negligence or willful misconduct. We conclude that such an exercise would engender subjective intent and credibility determinations.[22] Consequently, we agree that gross negligence "is a question of fact for the jury—under proper instructions from the trial court—as to whether, upon conflicting evidence, the plaintiff has been able to establish gross negligence." Stuart M. Speiser et al., 3 American Law of Torts § 10:18 (March 2023). Additionally, "Where more than one inference may be drawn from the facts that certain conduct constitutes gross negligence, it is for the jury to determine whether the conduct in the light of all the circumstances constitutes gross negligence." Id.

Therefore, considering the foregoing discussion, we conclude that formulating and interpreting the standards for gross negligence or willful misconduct are endeavors which belong to the judge and jury. We further find that tasking medical experts with utilizing legal concepts that entail an inquiry into subjective intent or credibility would be impermissible. Indeed, any opinion rendered using such a methodology would exceed the statutory authority given under the LMMA and would, therefore, be inadmissible. Thus, conducting a medical review panel in this manner would thwart the legislative aims of weeding out frivolous claims and reducing litigation costs. Judicial inefficiency would ensue.

---

[22] See also McGlothlin, 10-2775 (La. 7/1/11) 65 So.3d 1218, wherein the Supreme Court opined that "the opinion rendered [by the medical review panel] in this matter . . . does not conform to any of the statutory definitions because it is based on . . . impermissible credibility determinations." McGlothlin, 10-2775, p. 14, 65 So.3d at 1229. "It logically follows, therefore, the opinion rendered in this matter does not constitute an **expert opinion** as contemplated in the statutory scheme. . ." Id. at p. 14, 65 So.3d at 1229-1230 (emphasis in original). "Moreover, to the extent the panel's opinion exceeded its statutory authority and sought to resolve a material issue of fact explicitly reserved to the jury, we find the opinion is inadmissible." Id. at p. 14, 65 So.3d at 1230.

This argument is unpersuasive.

*Immunity Statute*

Bridgepoint argues that during a state of public health emergency, the LHEPA modifies the standard for negligence in La. R.S. 9:2794[23] and must be based on the gross negligence or willful conduct of the provider. Bridgepoint proposes that in order for a medical review panel to correctly perform its function as a filter for non-meritorious claims, the panel should first determine whether the standard of care was breached under the general negligence standard. If the panel finds that a breach occurred, the attorney chairperson would then advise the panel as to the gross negligence standard found in the La. R.S. 29:771(B)(2)(c), at which time the panel would render a second opinion based upon this modified standard of care.[24] Bridgepoint urges this Court to read the LMMA and the LHEPA *in para materia* in order to reach this same conclusion.

In contrast, Ms. Sebble submits that La. R.S. 29:770, et seq., is in actuality an "immunity statute" rather than a modified standard of care as Bridgepoint asserts. As such, the qualified tort immunity afforded to health care workers under this statute is only properly raised as an affirmative defense in a civil proceeding in an answer to a petition after the medical review process is complete and a lawsuit has been filed. To bolster this proposition, Ms. Sebble points to Louisiana Attorney General Jeff Landry's April 7, 2020 Memorandum in which the Attorney General specifically refers to La. R.S. 29:771(B)(2)(c) as one of several immunity

---

[23] *See* fn. 14.

[24] At oral argument before this Court, Bridgepoint clarified that with this proposal it envisioned that the panel would render two separate opinions if a breach was found to exist under the general negligence standard of care. Bridgepoint also alleged (without providing any corroboration) that there are medical review panels around the State which currently employ this two-step process.

statutes potentially available to health care workers during the COVID-19 pandemic. We agree.

First, our plain reading of the LMMA indicates that it contemplates but a single opinion to be rendered by the medical review panel. Neither does the LHEPA make any provision for such a multi-step process. Were we to adopt such a position espoused by Bridgepoint—a two opinion system—we would stray outside the confines of our role of statutory interpretation and impermissibly engage in legislation. It is well-settled that "the LMMA's limitations on the liability of health care providers are special legislation in derogation of the rights of tort victims, and as such, the coverage of the act should be strictly construed." *Billeaudeau v. Opelousas Gen. Hosp. Auth.*, 16-0846, pp. 10-11 (La. 10/19/16) 218 So.3d 513, 520 (citing *Sewell v. Doctors Hospital*, 600 So.2d 577, 578 (La. 1992)).

Second, a closer reading of La. R.S. 29:771 reflects that the legislators fully intended this to be an immunity statute.[25] La R.S. 29:771(B)(1) clearly delineates

---

[25] At the time of the alleged malpractice, La R.S. 29:771 provided, in pertinent part:

\* \* \*

B. Liability.

  (1) State immunity. State immunity shall be determined in accordance with R.S. 29:735, which shall be applicable to this Chapter.

  (2) Private liability.

\* \* \*

  (b) During a state of public health emergency, any private person, firm or corporation and employees and agents of such person, firm or corporation in the performance of a contract with, and under the direction of the state or its political subdivisions under the provisions of this Chapter shall not be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct.

  (c) During a state of public health emergency, any health care providers shall not be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct.

21

that "State immunity shall be determined in accordance with R.S. 29:735," whereas La R.S. 29:771(B)(2) indicates that this statute pertains to private actors. After enumerating several different circumstances in which a heightened standard for liability would apply during a public health emergency, La R.S. 29:771(B)(2)(e) provides in plain language that "[t]he immunities provided in this Subsection shall not apply to any private person . . . whose act or omission caused in whole or in part the public health emergency . . ."[26] As previously cited in this opinion, "[w]ords and phrases shall be read with their context and shall be construed according the common and approved usage of the language." La. R.S. 1:3. The appellate court in *Shepherd v. Baton Rouge Cardiology Center* opined, which is highly instructive here, that "[s]tatutory immunity may be raised as an affirmative defense in a defendant's answer to a petition after the medical review panel process is complete and a lawsuit has been filed."[27] *Shepherd*, 19-0802, p.6 (La. App. 1 Cir. 3/12/20), 300 So.3d 893, 898, fn 4 (citing La. C.C.P. art. 1005).[28]

---

(d) During a state of public health emergency, any private person, firm or corporation and employees and agents of such person, firm or corporation, who renders assistance or advice at the request of the state or its political subdivisions under the provisions of this Chapter shall not be civilly liable for causing the death of, or injury to, any person or damage to any property except in the event of gross negligence or willful misconduct.

(e) The immunities provided in this Subsection shall not apply to any private person, firm, or corporation or employees and agents of such person, firm, or corporation whose act or omission caused in whole or in part the public health emergency and who would otherwise be liable therefor.

[26] *See also* RUSS M. HERMAN & JOSEPH E. ''JED'' CAIN, LOUISIANA PRACTICE SERIES: DEFENSES—STATUTORY IMMUNITY § 4:81 (July 2022), (where La. R.S. 29:771 is listed as one of the statutory immunity statutes that might be used to assert a defense).

[27] *See White v. New Orleans Center for Creative Arts*, 19-0213, p.12 (La. App. 4 Cir. 9/25/19), 281 So.3d 813, 822 (where this Court found that immunity created by La. Ch. C. art. 611, which applies to mandatory reporters of child abuse, is an affirmative defense and is not properly raised via peremptory exception).

[28] La. C.C.P. art. 1005 provides:

In a concurring opinion, Judge McDonald further explained that "[d]uring the pendency of a medical review process . . . under La. R.S. [40:1231.8(B)(2)(a),][29] a health care provider against whom a medical malpractice claim has been filed may only raise peremptory exceptions of no right of action under La. C.C.P. art. 927(6) or prescription defenses under La. R.S. 9:5628." *Id.* at p. 1, 300 So.3d at 898. Consequently, "the proper means to raise statutory immunity is by an affirmative defense in an answer to a petition after the medical review process is complete and a lawsuit has been filed." *Id.*

Accordingly, we find that La. R.S. 29:771 is an immunity statute that may only be raised as an affirmative defense in an answer to a petition. Therefore, it would be procedurally incorrect to insert the concepts of gross negligence and willful misconduct into the medical review panel proceeding in the case *sub judice*. Rather, Bridgepoint may assert the qualified immunity found in La. R.S. 29:771(B)(2)(c) as an affirmative defense in an answer in the event a petition is filed following the conclusion of the medical review panel.

---

[t]he answer shall set forth affirmatively negligence, or fault of the plaintiff and others, duress, error or mistake, estoppel, extinguishment of the obligation in any manner, failure of consideration, fraud, illegality, injury by fellow servant, and any other matter constituting an affirmative defense. If a party has mistakenly designated an affirmative defense as a peremptory exception or as an incidental demand, or a peremptory exception as an affirmative defense, and if justice so requires, the court, on such terms as it may prescribe, shall treat the pleading as if there had been a proper designation.

[29] La. R.S. 40:1231.8(B)(2)(a) provides the exclusive list of exceptions that may be raised at the medical review panel stage:

A health care provider, against whom a claim has been filed under the provisions of this Part, may raise peremptory exceptions of no right of action pursuant to Code of Civil Procedure Article 927(6) or any exception or defenses available pursuant to R.S. 9:5628 in a court of competent jurisdiction and proper venue at any time without need for completion of the review process by the medical review panel.

**CONCLUSION**

For the foregoing reasons, we find no error in the district court's conclusion that La. R.S. 29:771(B)(2)(c), which is currently found at La. R.S. 29:771(B)(2)(c)(i), is inapplicable to a medical review panel proceeding. Accordingly, we affirm the judgment of the district court.

**AFFIRMED**